Our next case this morning is 5-25-0423 in the interest of Brayton C. Arguing for the appellant, Mr. Christopher Seeloff. We're going to have to leave Jennifer Camden. You look ready to proceed today? Yes, sir. Proceed when you're ready. Good morning, matters. Good morning, counsel. May it please the court. Assistant Appellant Defender Chris Seeloff here representing the respondent, Brayton C. Your honors, there are two things I will focus on today. The first primarily focused on in our opening brief, and the second primarily focused on in our reply brief. As to the first point, I can't emphasize enough that this was the state's burden to prove Brayton guilty beyond a reasonable doubt of accountability before the aggregate battery. This required them to put forward significantly more evidence than they did because the evidence that was presented at the adjudication hearing only showed that Brayton was merely present, which is itself not a crime. Relatedly, the second point I would ask your honors to focus on is the fact that Brayton, as well as the rest of the group that he arrived with, was a child at the time of this fight. And that's not to say that children are immune from criminal liability. Obviously, if that were true, we wouldn't be here today. But it is to say that all of the inferences that the state asked this court to draw, and for that matter asked the circuit court to draw at the adjudication hearing, really failed to account for this fact that Brayton was a child at the time of this incident. And so, therefore, all of the inferences about his arriving with the group, walking with them to the house, chanting what's up with them, even if he even did chant what's up with them, that's unclear. We'll get to that later. His actions at the time of the fight, his flight from the scene, his hiding from police, everything needs to be viewed through the lens of the fact that he is a child. He is not, as the state points him out, to be somebody, quote, bent on illegal activity. I realize that they reference that in reference to the case law, but they bring it up enough and in enough certain ways to make it sound like Brayton was, as well as part of this group, was like the Dillinger gang. And they weren't. They simply weren't. These are children. And so the standard view here being that whether any rational finder of fact, viewing the evidence in the light most favorable to the state, could find the evidence guilty. I would ask Your Honors. Was there an inference in the record that the defendant knew there was going to be a fight? No, Your Honor, and the state attempts to draw that inference, but to sort of draw out the idea and put a fine point on it, that the state's inferences that it asks this court to draw are unreasonable. Let's look at the chain of logic that requires, that would be required in order to find an inference that Brayton knew there was going to be a fight. A, he has to have been around B.C. when she received the phone call. There is no direct evidence of that. B, he has to have overheard what was said on the phone call, or at the very least overheard his sister at some point saying, okay, yes, let's meet up to fight or something to that effect. There was no real evidence put forward of that. C, or third, there has to have been some understanding on his part that the fight, these words that initiated the fight were actually intended to initiate a fight and not, as I've been sort of putting a fine point on here, a child saying weird, you know, random things. D, the state has to have shown enough evidence for reasonable inference that Brayton had some meaningful ability to get away from this group, right? They never point out that there's no evidence where this phone call happened, let alone no evidence that Brayton was in the car, no direct evidence, I should say, that Brayton was in the car, overheard and understood it to be an invitation to a fight. But it's also important to note there's no indication where they were when this call happened. As B.C. testified, the group had been hanging out for a while, but that could mean that they had been driving around and maybe they were 10 miles away from Brayton's home, so I guess he could have done the adult responsible thing and said, I'm going to get out of the car now and go home. I don't feel comfortable. But what if he was 10 miles away from home and he had a three to four hour walk home or something, right? If all these chains of inferences that the state has to make, each one itself is unreasonable, and then when you try and mash them together, it creates one large unreasonable inference about what was happening on that night. But the state does point that he showed up and arrived, right, with the group, and they walked up and they were chanting, hey, what's up? But there is no indication of who exactly in the group was saying what's up, making these shouting noises, right? Kaylin Hayner, one of the victims, testified that they, quote, were saying what's up, but she never said who specifically. There was never any evidence that it was all four were saying what's up, so it could have been just as likely that Brayton wasn't saying what's up. And even if he was, again, a group of kids walking around saying what's up is not a crime. It's certainly not the crime of aggravated battery in a public way that the state charged. Going further and to the point where they show up, and it seems pretty clear from the evidence and undisputed that when they showed up, the spike happened pretty quickly. The group started chanting what's up, Hayner came down, B.C. punched her in the face, bam, we've got a sprung. But from here, right, what evidence do we have that Brayton was involved? From my end of the record, and I think from the state's admission, certainly nothing direct. Nobody said Brayton threw a punch, right? Or Brayton was, I saw him trying to pull Kayla Brennbaugh away to distract him or pull him away from the fight, right? Nothing like that. It's all inferences. So what are these inferences? Well, there was some boy, one of the two boys, had his hands in his pocket or in his waistband and maybe he was reaching for a gun or a weapon or maybe he was just trying to intimate that, but I would point out no weapon was found. Nobody pointed out who this boy that was allegedly reaching into his waistband or pocket was. But we've got this baseball bat right there. That's a weapon. That was found at the scene. But there's no indication, speaking to the baseball bat, what size it was. The only evidence we have in the record on appeal is that it was a pink baseball bat. We have no indication of size, width, weight, material. It could very well have been, if you're honest, have been to a baseball park before and been to the gift shop, they sell those little souvenir less than a foot long baseball bats. If there's no criminal design or shared intent, why run? Again, Your Honor, because it's a child. And not to say that he hasn't been in trouble before, right? He was on probation at the time. Sure, he could have stayed. He could have said, I'm going to do it again. Imputing a level of sort of maturity that may not have achieved at that point, he could have said, I'm going to stay, do the responsible thing, tell the police what happened, and I'm going to plead my case. Maybe if he were a rational, sensible adult who was in that situation and wasn't currently on probation and wasn't supposed to be breaking his home confinement, perhaps that would have been a rational thing to do. But he was a child who, again, we have no evidence that he was a part of this fight, as a principal or accountable. And his friends had run away. He knew that if the police showed up, he would be busted for breaking his home confinement. And beyond all that, even if he knew the police weren't going to come, and it was just his friends that had run away, now he's alone with the two grown adults who had made the decision to fight the group of friends, children that he had been hanging around with. I don't think any rational person, even an adult in that situation, would stay around. At the very least, they'd probably put some distance between them and the group. So the evidence of flight, and we put a fine point on it in the reply brief, but I think it is, to put it charitably, remarkably unpersuasive of anything other than the fact that he was around to fight. He knew that if he'd stayed around, he at best would have been caught by police for breaking home confinement, more likely could have been retaliated against by the two grown adults who had agreed to fight children only moments earlier. So, in all these instances, and just with my brief time left, I'd like to point out the evidence the state didn't present, right? We bring it up in the opening of the reply brief, but no DNA or fingerprints on the baseball bat, no pictures of any of the four children immediately after or while they were being detained during the show up at Reddenball, despite Evans, Officer Evans testifying that he later took pictures of Hayner at the hospital with his own phone. So it's perfectly reasonable that he could have taken pictures of all four of them and then testified at the show up, okay, I took these pictures and Reddenball told me that this person in this mask, you know, with the mask off or whatever, this is the person who was involved, this is the person who wasn't, and then we would have known for certain. But it's not Brayden's job to fill in those gaps for the state. It's not Brayden's job to try and make unreasonable inferences reasonable. It's the state's job to prove him guilty beyond a reasonable doubt, and when they fail to do that and when they rely entirely on unreasonable inferences, then a conviction must be reversed because it rests, it violates the presumption of innocence and it rests on something less than proof beyond a reasonable doubt. And that's why we ask your honors to reverse these convictions outright and amend for further hearings on his petitions to revoke and the petitions to invoke adult sentences. Given all that you've said, though, is it our standard, I mean not standard, but are we to consider the evidence in the light most favorable to the state in this situation? Yes, Your Honor, and that's why in the beginning when I mentioned the standard review, it's review the evidence in the light most favorable to the state. Could any rational finder of fact, and that's why I highlighted the word rational, could any rational finder of fact have found him guilty? And only that implicates the idea of these reasonable inferences. And if all the inferences are unreasonable, then only an irrational finder of fact could have found him guilty. And it's not a judgment call necessarily on the circuit court at the adjudication hearing. It's just saying that it perhaps didn't recognize that all these inferences, you know, when you lay them out very clearly in a line and you show the sort of sum total, it becomes very easy to see how these are irrational and unreasonable inferences. But at the time of trial, when you're trying to piece it all together, and if Your Honors can make a clear statement out of this record, I applaud you, because it's very, very hazy and unclear, but it has to be a rational finder of fact that they have found him guilty beyond a reasonable doubt, and I just don't think that happens in this case. Thank you. Questions for Justice Kagan? Justice Kagan? No, thank you. I appreciate our argument to be given an opportunity for rebuttal shortly. Ms. Camden, you're ready to proceed. Yes, Your Honor. Thank you. May it please the Court, counsel? Jennifer Camden on behalf of the people. The Respondent concedes that an aggravated battery occurred and that he was present at the scene. The parties disagree about the sufficiency of the evidence that he was guilty of the aggravated battery on the theory of accountability. However, when viewing the evidence in the light most favorable to the State, this Court should conclude that a reasonable trier of fact indeed could have found beyond a reasonable doubt that he was accountable for the aggravated battery under either a shared intent theory or the theory of a common criminal design. So this Court may affirm the adjudication and disposition in Case No. 161 under either theory, and if it does, this Court should also affirm the judgments in the other two cases consolidated here for review. Now, the Appellate Court has set forth a number of factors that have been held to support a finding of accountability, and those are discussed in the People's Answer Brief, and those factors were present in this case. First, the Respondent was present during the preparation of the offense. In fact, he participated in it. There was evidence that he was present in the vehicle with the other three assailants when the aggravated battery was planned, and that he was present in the vehicle when four arrived and parked around the corner from the victim's home about 100 yards away. There was evidence that he joined the other three in walking around the corner together and approaching the home of the victim together while the group was yelling things like, There was also evidence that all four of those people wore hoods up and that the Respondent and the other male assailant, C.B., had pulled black masks over their faces to conceal everything but their eyes, and that this was done before they approached the home. And there was evidence that one of the two males held a baseball bat as they approached the home together. So this all shows and supports the inference that the Respondent knew of the planned fight, that there was a plan to conceal the vehicle. And all of everything he just said simply supports the conclusion that, yeah, he was there. What did he do? Well, Your Honor, the people used those factors to establish that a common criminal design could be inferred at that point. And the Defendant's involvement in the spontaneous acts of a group is sufficient for liability under that theory. The State need not actually prove the existence of a preconceived plan. And in this case, there was evidence of his involvement in the aggravated battery, that he engaged in not one but two different affirmative physical acts during the battery. And either one of those acts, standing alone, would be sufficient to support finding that he joined in the common criminal design or shared the intent to batter the victim. And either act, standing alone, shows that he aided and abetted or attempted to aid and abet the commission of the aggravated battery while possessing the requisite mental state, the intent to promote or facilitate that fact. Maybe he just wanted to watch a fight. Is that accountability? Well, Your Honor, the evidence shows that he did more than that. First, the victim, Kaylin, testified twice during her testimony that the second male, meaning the Respondent, quote, was trying to jump into the fight and that her older brother, Caleb, quote, was holding him back. And that's record pages 153 and 54 and page 156. And her brother testified consistent with that, saying that he kept both of the males, quote, at bay. So based on the victim's repeated testimony that the Respondent tried to join CB and the two female assailants in piling onto her and battering her, the trial court could have found that the Respondent, with the intent to promote or facilitate the aggravated battery, quote, aided or attempted to aid in that offense in satisfaction of the accountability statute. There was also evidence of a second affirmative physical act, which was this. There was evidence that one of the two males swung the bat and hit Caleb, and the evidence was not clear which one that was. And the trial court took that into account in rendering its decision in which it rejected count three, the unlawful use of weapons charge. But there was evidence that the other male, the one who did not swing the bat, ran up to Caleb, acted like he had something at his waist, and, quote, acted like he was going to do something. And Caleb demonstrated for the Court that Caleb made a physical motion in response to those acts of intimidation. We don't know what physical act that was. And, of course, any silence in the record should be construed against the Respondent here. And the trial court could find, and, again, this is separate and apart from Kalen's repeated testimony that the Respondent tried to jump into the pylon of her. Separate and apart from that, the trial court could have concluded from that evidence that the Respondent, if he was indeed the second male, the one who did not swing the bat, had aided, abetted, or attempted to aid in the battery of Kalen because approaching Caleb in that manner after he'd been hit with the bat would have been an attempt to impede or otherwise occupy Caleb as he, as Kalen, had been attempting to pull people off of his younger sister. Now, in addition to the factor supporting the finding of accountability here, which is that the Respondent was present during the aggravated battery without disapproving or opposing it, there was also the evidence supporting other factors supporting the finding of accountability, which are that the Respondent continued his affiliation with the other offenders after the commission of the crime and that he fled with them from the scene. The evidence showed that the four fled together in the direction of the vehicle in which they had arrived, and when police arrived, they found the Respondent hiding in the floorboards of the driver's seat. The other male assailant was also taking cover inside the vehicle. And this evidence of flight shows consciousness of guilt and his continued affiliation with the others, this additional evidence supporting a finding of accountability. Now, the Respondent argues that these factors should have carried little weight with the trial court because little time passed between the time of the battery and the time that the police arrived, and perhaps there was an innocent or sort of innocent explanation for his flight in that he was violating his probation. But, of course, it was for the trial court to assign weight to those factors, and he fled with those people in the same direction and hid in that vehicle, indicating, again, that close affiliation. The Respondent has suggested a hypothesis of innocence that the trial court could have rejected. And the same is true for the Respondent's arguments that the evidence that he approached with the others, that he wore a mask even, the Respondent proposes that those facts could have had an innocent explanation as well. But, again, the trial court need not have credited a reasonable hypothesis of innocence, and the question on appeal is whether the evidence supports a finding of accountability when viewed in the light most favorable to the State, and this was evidence supporting that finding. Also, the Respondent argues that despite the evidence of his preparation, of his presence during the preparation of the offense, that the trial court should be presumed to have credited the testimony of the Respondent's sister that the Respondent was not actually aware of the plan. He argues that the trial court never specifically stated that it disbelieved her testimony when the court was explaining its findings. My response to that is that the trial court didn't specifically say what weight it was assigning to the testimony of Respondent's sister that he didn't know about the fight ahead of time, and this court should reject the Respondent's attempt to use that silence in the record against the State, which is the appellee here. The trial court was free to credit whichever parts of B.C.'s testimony it found credible, and here the court specifically said that it disbelieved her testimony that he stayed in the vehicle during the battery, and based on its adjudication of guilt, the court also presumably disbelieved her testimony that he didn't know about the fight, which was planned in a vehicle in which he was a passenger in a conversation occurring right before the fight occurred. Based on the evidence that he was present during the call and that he participated in the preparation of the offense, such as, for example, donning a mask and approaching the home with another masked male assailant, the trial court reasonably could have inferred that he knew of the attack before it occurred, despite her testimony to the contrary, which the court is presumed to have afforded little weight or to have disbelieved altogether. For these reasons and the reasons set forth in the People's Answer Brief, I respectfully request that the court affirm. Thank you. Justice McCain, any other questions? No. Thank you. Mr. Stegall, after you. Yes, Your Honor. Your Honors, I'll try to keep this brief. There's a lot I would like to point out, but I'll start... The state just rattled off a whole bunch of facts that show more than mere presence, so what say you? I would like to first point out a major structural point that I think goes to a lot of what the state is trying to do in its time here today. They say any silence in the record has to go against the respondent. That is simply not true. I don't know where they're getting that from. I don't know what their case law site is, but silence in the record does not mean reasonable inference against the defendant or respondent in a criminal case. It does not say that you no longer have the presumption of innocence or that the state is required to prove guilt beyond a reasonable doubt. So I don't know what they're arguing at that point, but I just want to push back as hard against it as I can. I also want to point out that the state is trying to, as we pointed out in the reply brief, is trying to have it both ways with BC's testimony. They rely on BC's testimony for all this evidence of preparation, which I will get to, but that is specifically the only evidence they rely on to show that Brayden was somehow present during the preparation of this offense. And then when Brayden points out that, well, actually, BC said, not even pointing out that BC said that he wasn't there, but that he didn't have any part in the preparation of the fight, now the state comes back. Oh, no, no, no, no, no, no, no. The state discounted her testimony. You can't rely on BC. What are you talking about? The state's trying to have it both ways. They try to couch it a little bit here and say, well, you know, actually, just the judge made a reasonable inference about what could and could not, but that's not what they put in the brief, and it's a little disingenuous to have it both ways. The state said that he participated in the planning. He was there for it. I went through all that on the opening. You have to follow a crazy chain of inferences about no evidence that he was actually in the car during the call. If you do believe he was in the car, you have to understand that he overheard what was said. If you do believe that he overheard what was said, you have to believe that he knew that it was evidence of a fight. If you believe that it was evidence of a fight, you have to also then infer that he actually believed it to be legitimate, right? All of these factors going through, and the state didn't present any evidence on that point of trial. So they're asking you to grab these bits and pieces that have no relation to each other and jam it into the proof beyond a reasonable doubt box, and it just doesn't fit. The most that can be said about the two boys who were present is that they were present, right? Beyond that, any identification we have is, as I mentioned, sorry, I'm going over time to answer Justice Wong's question. If your honors can honestly make heads or tails of this record on one pass, it took me five or six read-throughs of the adjudication hearing just to figure out who was saying what about who in order to get started working on the brief. Kaylin and Caleb both refer to the two boys sort of interchangeably. Kaylin and Caleb both at certain points say four boys. They say, oh, no, the two boys and not the one with the bat, the other boy. But the other boy may have had the bat, but no, he had his hands in his pocket, right? It just goes on and on like that. And that's not to say, again, it's no value judgment against Kaylin and Caleb. It's to say that it was the state's burden of proof to make this a clear case, right? To prove beyond a reasonable doubt the guilt and by accountability, right? So if you're going to say he didn't have any part as a principal, then you have to be abundantly over extra clear about what it was he was doing that wasn't directly involved in the fight, but somehow aided, amended, facilitated, otherwise made this fight go through without him being a direct principal. Given the kind of confusing nature of that testimony, the other boys, the two boys, the one boy's doing this, doesn't that imply that both boys are actively involved in this? That's kind of confusing. It's an ongoing fight with everybody kind of involved? Your Honor, if not for the fact that both Kaylin and Caleb say that effectively one boy just wasn't involved in the fight and all this, Kaylin explicitly said, was asked, was the fourth person, the second boy, was he involved in the fight? Kaylin said, no, not so much. Just the three I'm aware of. She did mention something about him trying to jump in, right? And Caleb making some physical gesture. But again, it's the State's burden to put forward proof beyond a reasonable doubt of what that was. We don't know what the gesture was that Caleb did or the other boy did. We don't know what Kaylin said, meant when she said, arguing. Again, as we pointed out in the opening of the library, argument is not a crime, especially when you see a grown woman attacking your younger sister, who I believe was 16 or 15 at the time. All of these inferences, again, the State just puts it out there like it's gospel truth. And when you look at the record, as we pointed out in the briefing, everything requires this unreasonable jump to fill in the gaps. And that is why we are asking this Court to reverse the conviction's outcome. Thank you. Questions, Justice McHale? We'll take four. Thank you, Your Honor. I appreciate your arguments. I, at one time, inadvertently insulted Mr. Seehoff by going, tell the story. We do moot court together sometimes down at SIU. And we were on a panel together. When we finished, I was trying to be complimentary to the students. I said, you do a better job than many of the people that appear in front of us. They're getting it. Mr. Seehoff appears in front of me. So both sides did an excellent job today. It is kind of a confusing record, and I appreciate the job you both did. We'll take the matter under advisement and issue a decision on a new course. Thank you.